AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)      ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| United States of America | |
| v. | |
| MARVIN EUGENIO DE LEON, | Case No.    2:22-mj-00630 -duty |
| Defendant | |

**LODGED**
CLERK, U.S. DISTRICT COURT

**2/16/2022**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ JB _____ DEPUTY

**FILED**
CLERK, U.S. DISTRICT COURT

February 16, 2022

CENTRAL DISTRICT OF CALIFORNIA
BY: ___ ch ___ DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of February 3, 2022 in the county of Los Angeles in the Central District of California, the defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1708 | Mail Theft |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/ Gerardo Ramirez*
*Complainant's signature*

_____
Gerardo Ramirez, United States Postal Inspection
Service, Postal Inspector
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    **February 16, 2022**

_____
*Judge's signature*

City and state:    Los Angeles, California

_____
Hon. Paul Abrams, U.S. Magistrate Judge
*Printed name and title*

AUSA: Rachel N. Agress (x0487)

## AFFIDAVIT

I, Gerardo Ramirez, being duly sworn, declare and state as follows:

### I.   PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of criminal complaints against, and an arrest warrants for, Marvin Eugenio De Leon ("DE LEON"), Brianna Jimenez, also known as Briana Jimenez ("JIMENEZ"), and Oscar Rodriguez ("RODRIGUEZ"), for violation of Title 18, United States Code, Section 1708 (Mail Theft).

2.   This affidavit is also made in support of applications for warrants to search the following property and persons described more fully in Attachments A-1, A-2, A-3, A-4, A-5, A-6, A-7, A-8 and A-9, which there is probable cause to believe are currently located in the Central District of California:

a.   The residence located at 1704 E. McMillan St, Compton, CA 90221, in Los Angeles County, in the Central District of California, registered to A.R. as of October 2021 (the "SUBJECT PREMISES"), as further described in Attachment A-1, where, as discussed below, based on surveillance, the SUBJECT VEHICLES (as defined below) have been parked before and after several mail theft incidents.  In addition, California DMV records show that J.J.N., a known South Side Locos gang member, resides at the SUBJECT PREMISES.

b.   A 2015 black BMW 740Li, bearing California license plate number 8BLJ999, Vehicle Identification Number

WBAYE4C53FD947468, previously registered to M.S. in San Diego, California and sold to CARMAX on November 24, 2021 with no subsequent public records of transfer of title ("SUBJECT VEHICLE 1"), as further described in Attachment A-2, and used during the course of the offenses;

       c.   A 2012 silver Porsche SUV, bearing California license plate 6VGZ159, Vehicle Identification Number WP1AA2A2XCLA06385, registered to R.M. in Mission Hills, California ("SUBJECT VEHICLE 2"), as further described in Attachment A-3, and used during the course of the offenses;

       d.   A 2006 white Range Rover, bearing California license plate JROD2, Vehicle Identification Number SALSH23416A967238, registered to F.R. in Fallbrook, California ("SUBJECT VEHICLE 3"), as further described in Attachment A-4, and used during the course of the offenses;

       e.   The person of DE LEON, as further described in Attachment A-5;

       f.   The person of JIMENEZ, as further described in Attachment A-6;

       g.   The person of RODRIGUEZ, as further described in Attachment A-7;

       h.   A red Apple iPhone with cracked rear camera and cracked front screen recovered in a black "Supreme" case ("SUBJECT DEVICE 1"), seized on or about December 20, 2021, by the Torrance Police Department ("TPD"), and currently in the custody of the United States Postal Inspection Service in Long

Beach, California, as described more fully in Attachment A-8 and
believed to belong to DE LEON;

        i.    A space grey Apple iPhone recovered in a Mickey
and Minnie Mouse case, seized on or about December 20, 2021, by
the TPD ("SUBJECT DEVICE 2" and, together, "SUBJECT DEVICES"),
and currently in the custody of the United States Postal
Inspection Service in Long Beach, California, as described more
fully in Attachment A-9, and believed to belong to JIMENEZ; and

       3.    The requested warrant seeks authorization to seize
evidence, fruits, or instrumentalities of violations of Title
18, United States Code, Sections 371 (Conspiracy), 1028 (Fraud
and Related Activity in Connection with Identification
Documents, Authentication Features, and Information), 1028A
(Aggravated Identity Theft), 1029 (Access Device Fraud), 1344
(Bank Fraud), 1349 (Conspiracy to Commit Wire Fraud and Bank
Fraud); 1708 (Mail Theft and Possession of Stolen Mail), and
2114 (Robbery of United States Mail and Property) (collectively,
the "Subject Offenses"), as described more fully in Attachment
B.  Attachments A-1, A-2, A-3, A-4, A-5, A-6, A-7, A-8 and A-9
and B are incorporated herein by reference.

       4.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested complaint and
warrants, and does not purport to set forth all of my knowledge
of or investigation into this matter.  Unless specifically

indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.   I am a Postal Inspector with the United States Postal Inspection Service ("USPIS") and have been so employed since February 2013.  As part of my training as a United States Postal Inspector, I attended a twelve-week training course in Potomac, Maryland, which included training in the investigation of mail theft.

6.   I am presently assigned to the Los Angeles Division, Long Beach Mail Theft Team, which investigates crimes against the United States Postal Service ("USPS") and crimes related to the misuse and attack of the mail system, including theft of United States mail ("US Mail"); possession of stolen US mail; fraud, related activity in connection with access devices (including credit and debit cards), robberies, burglaries and identity theft.  As part of the Mail Theft team, I have worked closely with, and learned from, other Postal Inspectors on investigations of crimes in connection with access devices that include credit cards and debit cards, identity theft, and unauthorized use of other persons' information for financial gain, as these criminal schemes have been known to be perpetrated through the US Mail.

## III. SUMMARY OF PROBABLE CAUSE

7.   On at least eight occasions between approximately December 2, 2021 and approximately February 4, 2022, one or more individuals subsequently identified as DE LEON, JIMENEZ and

4

RODRIGUEZ, with others known and unknown (the "Target Subjects"), drove up to loading docks of United States Post Offices throughout the Central District of California, and stole trays or tubs of mail ("hits").  During each hit, two or more of the Target Subjects drove a car up to the loading dock and parked.  One or more of the Target Subjects jumped out of the car, grabbed trays or tubs of mail, ran back to the car, dumped the mail inside the car, and drove away.

8.   During one hit on or about December 16, 2021 at the Montebello Post Office, a postal employee attempted to stop three suspects, one of which was later identified as JIMENEZ, from driving away with stolen mail.  JIMENEZ and another unidentified suspect threatened to shoot the postal employee and made gestures as if appearing to reach for firearms, and subsequently and got away.

9.   Thus far, DE LEON has been identified as a participant in at least two hits (December 2, 2021 and February 3, 2022), JIMENEZ has been identified as a participant in at least two hits (December 13, 2021 and December 16, 2021), and RODRIGUEZ has been identified as a participant in one hit (February 2, 2022).

10.  When law enforcement executed a search warrant on the SUBJECT PREMISES on September 29, 2021, DE LEON, RODRIGUEZ and another individual, J.J.N. were all found residing at the SUBJECT PREMISES.  During the search, law enforcement found strewn around the house piles of mail in other people's names,

including in J.J.N.'s and DE LEON's bedrooms, as well as empty gun cases (i.e., boxes in which firearms are purchased).[1]

11.  According to enforcement surveillance and databases, SUBJECT VEHICLES 1 through 3, which were used by the Target Subjects to carry out different hits, were parked at the SUBJECT PREMISES in the hours or days directly before or after Target Subjects were conducting hits.

12.  In addition, on December 20, 2021, after employees observed a 2019 black Infinity FX3 SUV (Infinity FX3)[2] canvassing the Torrance Post Office, TPD performed a traffic stop of the Infinity FX3.  DE LEON, JIMENEZ, and E.J.A. (age seventeen and ten months) and R.M.B. (age sixteen) were inside.  TPD recovered the following from inside the vehicle:  SUBJECT DEVICES 1 and 2; 76 checks not in the name of any of the car's occupants, including eight checks drawn on the account of the Montebello Unified School District, as well as ATM receipts; and approximately 10 debit cards, including Bank of America debit cards, and mail not in the name of any of the car's occupants. DELEON was overheard telling JIMENEZ that one of the cards had over $20,000 on it.

13.  Follow up investigation with Bank of America revealed the following:  Five deposits were made on December 16, 2021

---

[1] A 40 caliber Smith and Wesson firearm was also recovered from J.J.N.'s room, behind his bed, and on that date, J.J.N. was arrested for being a felon in possession of a firearm in violation of California Penal Code Sections 29800(a)(1).

[2] The Infinity FX3 is not included in this warrant because it was searched when it was impounded pursuant to the traffic stop and is currently still impounded.

into accounts affiliated with the debit cards and ATM receipts found in the Infinity FX3 by TPD totaling approximately $29,000. None of these accounts were in the name of DE LEON, yet DE LEON is recognizable in ATM footage depositing the checks. One of these checks was made payable by Montebello Unified School District. A representative from MUSD informed me that they drop off bulk checks at the Montebello Post Office's dock, and made a delivery of checks to the dock on December 16, 2021. To date, MUSD has identified approximately $300,000 in fraudulently negotiated checks from December 2021 which were dropped off at the Montebello Post Office dock.[3]

14. As discussed below, the SUBJECT VEHICLES and SUBJECT PREMISES have been used in the course of and in furtherance of the mail theft conspiracy.

## IV. STATEMENT OF PROBABLE CAUSE

15. Based on my review of law enforcement reports conversations with other law enforcement officers, and my own involvement in the investigation, I am aware of the following:

---

[3] Also, within the timeframe of the hits on the postal docks described herein, other victims have reported financial losses based on checks which were fraudulently negotiated after having been brought to the USPS for processing. Specifically, Los Angeles Unified School District ("LAUSD") reported close to $2 million in losses based on their stolen and fraudulently negotiated checks which they mailed between on or about December 15, 2021 and on or about December 23, 2021, and which were collected by a postal service employee who in the regular course would have dropped them off in a bulk mail container at the Pico Rivera Post Office loading dock.

**A.**  **DE LEON and Two Unidentified Suspects Carry Out Hit Using SUBJECT VEHICLE 2 at Montebello Post Office on December 2, 2021**

16.  On or about December 2, 2021, a supervisor at the Post Office located at 145 N. Fifth St, Montebello, California 90640, reported to the USPIS that at approximately 2:40 p.m., a postal driver witnessed three suspects conducting a hit at the Montebello Post Office with SUBJECT VEHICLE 2, a silver Porsche SUV.

17.  The incident was captured by a postal truck that had a dash camera as well as by surveillance cameras on the dock of the Montebello Post Office.  I reviewed both sets of video footage.  SUBJECT VEHICLE 2 pulled up and stopped next to the dock while two suspects walked onto the dock and stole two trays of mail.  The suspects then jumped off the dock, placed the mail inside SUBJECT VEHICLE 2 which was driven by a getaway driver, climbed inside the car and drove away.  One of the suspects (later identified as DE LEON) appears to be over 6 feet tall and heavy set, wearing a backwards black baseball cap with a white "W" (Washington Nationals logo).  The other suspect appears to be shorter and wearing a black jacket with a hood covering his/her head.

18.  Using law enforcement technology, the camera footage was enhanced to determine SUBJECT VEHICLE 2's partial license plate, which along with the car's make and model, was used to identify SUBJECT VEHICLE 2 as matching these characteristics. In addition, following this identification, SUBJECT VEHICLE 2

has been seen at the SUBJECT PREMISES, the same location to which other cars involved in the postal hits are returning.

**B.   Identification of SUBJECT VEHICLE 2 at the SUBJECT PREMISES**

19.   The Glendale Police Department informed me, based on a review of their law enforcement databases, that the license plate of SUBJECT VEHICLE 2 was identified as parked on the same block as the SUBJECT PREMISES on or about December 5, 2021, at approximately 5:11 a.m., leading me to believe that the individuals who own or drive SUBJECT VEHICLE 2 sleep at the SUBJECT PREMISES.

**C.   Identification of DE LEON as a Target Subject, Based On Prior Search of SUBJECT PREMISES, During Which Mail and a Firearm was Found**

20.   A deputy from the Los Angeles County Sheriff's Department ("LASD") informed me that on September 29, 2021, local law enforcement executed a search warrant on the SUBJECT PREMISES, and found five individuals residing at the SUBJECT PREMISES, including DE LEON, RODRIGUEZ, and J.J.N., a convicted felon.  DE LEON resided in one bedroom, J.J.N. resided in a second bedroom, and RODRIGUEZ resided on the couch.  The basis for the warrant was a previous incident where DE LEON and J.J.N. were stopped in a vehicle with two firearms.

21.   According to the deputy, during the prior search of the SUBJECT PREMISES, law enforcement found strewn around the house piles of mail in other people's names, including in J.J.N.and DE LEON's bedrooms, as well as empty gun cases (i.e., boxes in which firearms are purchased).

22.  Also according to the deputy, gun dogs also alerted to a 40 caliber Smith and Wesson firearm in J.J.N.'s room, between his bed and the wall, which J.J.N. admitted was his in a post-Miranda interview.  On that date, J.J.N. was arrested for being a felon in possession of firearm and ammunition in violation of California Penal Code Sections 29800(a)(1) and 30305(a)(1), and vandalism, in violation of California Penal Code Section 594(b)(1).[4]

23.  I provided a physical description of the suspect from the December 2, 2021 theft of mail from the Montebello Post Office, and the deputy said that description matched DE LEON and provided a booking photo.  I reviewed DE LEON's booking photo and physical description and the footage, and the physical attributes of the individual captured on video while stealing mail from the Montebello Post Office on December 2, 2021 match those of DE LEON.

**D.  Three Unidentified Suspects Carry Out Hit Using SUBJECT VEHICLE 3 at Buena Park Post Office on December 8, 2021**

24.  On or about December 8, 2021, a supervisor at the Buena Park Post Office located at 7377 La Palma Ave, Buena Park, California 90622, reported to the Buena Park Police Department that at approximately 4:20 p.m., a USPS employee, P.G., witnessed two male suspects and one female suspect conducting a

_____

[4] Based on law enforcement reports, J.J.N., DE LEON, E.J.A. and R.M.B. were all arrested for firearms-related offenses together on August 4, 2021.  J.J.N. and DE LEON were both arrested for firearms-related offenses together on August 16, 2021.  J.J.N. was again arrested on November 17, 2021 for being a felon in possession of a firearm in violation of California Penal Code Section 29800(a)(1).

hit at the Buena Park Post office with SUBJECT VEHICLE 3, a
white Range Rover.  According to P.G., one of the male suspects
stole two trays of mail from the dock.  P.G. attempted to
intervene and yelled at them to stop.  The male placed the mail
inside SUBJECT VEICHLE 4, and then fled on foot.  P.G. described
the female as heavy-set female, about 5'6", with black hair and
a pony-tail, and the male suspect who fled as Hispanic and 5'9".
P.G. used his/her phone to photograph the male suspect fleeing
and the rear of SUBJECT VEHICLE 3 as it drove off.  SUBJECT
VEHICLE 3 bore California license plate JROD2.

    **E.**    **Identification of SUBJECT VEHICLES 2 and 3 at the
SUBJECT PREMISES on December 9, 2021**

    25.  The next day, on or about December 9, 2021, between
approximately 2:00 p.m. and 3:15 p.m., I observed SUBJECT
VEHICLES 2 and 3 parked in front of the SUBJECT PREMISES.
SUBJECT VEHICLE 2 was parked directly behind SUBJECT VEHICLE 3.
The front bumper of SUBJECT VEHICLE 2 was pressing against the
rear bumper of the SUBJECT VEHICLE 3, so that it was not readily
visible from the street.

    **F.**    **JIMENEZ and Two Unidentified Suspects Carry Out Hit
Using the Infinity FX3 at Torrance Post Office on
December 13, 2021**

    26.  On or about December 13, 2021, a supervisor at the
Torrance Post Office located at 2510 Monterey St, Torrance,
California 90503, reported to the USPIS that at approximately
5:05 p.m., a USPS employee witnessed a female suspect (later
identified as JIMENEZ) and an unidentified driver conducting a
hit at the Torrance Post Office with the Infinity FX3, a black

Infinity SUV.  According to the USPS employee, JIMENEZ stole a tray of mail from the loading dock.  When the USPS employee attempted to follow her, JIMENEZ hurriedly climbed into the Infinity FX3, which sped away.  The USPS employee was able to capture a photograph of the rear of the Infinity FX3.  I viewed the photograph, which shows California license plate number 8JIP110.The suspect was described as a female with short, medium build, female Hispanic in her 20s, approximately 5'0" to 5'4" tall, with blond curly hair, 20 to 30 years old.  This physical description and physical attributes match those of JIMENEZ, who was stopped in the Infinity FX3 by law enforcement on December 20, 2021, and match her appearance during a post-arrest interview on December 21, 2021 that I conducted.

### G.    JIMENEZ and Two Unidentified Suspects Carry out Strong Arm Robbery Using Infinity FX3 at Montebello Post Office on December 16, 2021

27.  On or about December 16, 2021, a supervisor at the Montebello Post Office reported to USPIS that at approximately 3:10 p.m., he/she was checking some equipment on the loading dock when he/she noticed a female suspect (later identified as JIMENEZ) and a male suspect stealing a tray of mail.  According to the supervisor, he/she yelled "Hey, stop!" at the suspects as he/she ran after them.  The male suspect got into the rear passenger seat of the Infinity FX3, a black Infinity, that was parked near the loading dock.  JIMENEZ climbed into the front passenger seat.

28.  The supervisor caught up and opened the front passenger door to try to take back the mail back when the male

driver of the vehicle threatened, "Don't make me shoot you" and reached into his rear waistband area with his right hand, as if he was going to access a firearm.  JIMENEZ also threatened to shoot the supervisor and reached towards the center console, as if she was going to access a firearm.  The supervisor backed off and the Infinity FX3 drove away.

29.  The supervisor used his/her phone to take a photograph of the rear of the Infinity FX3.  The supervisor described the driver as a heavy-set male, with a dark complexion who was not wearing a face mask, with tattoos on his neck and possibly on his face.

30.  The supervisor described the female as being in her mid-20s, heavy-set, approximately 5'4" to 5'5" tall, with "dirty blonde" hair with a shade of orange/red ("ginger"), wearing a baggy pink sweater and black sweat pants.

31.  The supervisor described the male suspect who accompanied JIMENEZ on the dock as Hispanic, in his early 20s, approximately 5'8" tall, with a slim build and a dark complexion, wearing a white sweater with blue stripes.

32.  The robbery was also captured on two surveillance cameras.  Based on my interactions with JIMENEZ during a post-arrest interview on December 21, 2021, and from reviewing the surveillance footage, I identified JIMENEZ as the suspect captured on video while stealing mail from the Montebello Post Office on December 16, 2021.

**H.   The Infinity FX3 Canvasses Torrance Post Office on December 20, 2021**

33.   On or about December 20, 2021, at approximately 6:03 p.m., a supervisor at the Torrance Post Office reported to the Torrance Police Department that a USPIS employee saw the Infinity FX3 driving back and forth and circling the dock area of the post office, and recognized it as a vehicle that had previously been involved in hits.[5]  The suspects appeared to be looking for the mail trays, which had been moved off the dock, due to the prior hits.  The USPIS employee reported that the Infinity FX3 had since left at the time of the report, and was no longer at the Torrance Post Office.

**I.   Traffic Stop of DE LEON, JIMENEZ, E.J.A. and R.M.B. in the Infinity FX3 on December 20, 2021 With Checks, Debit Cards and Mail Not In Their Names**

34.   On December 20, 2021, shortly after the report received from the Torrence Post Office, a TPD Officer located the Infinity FX3 a short distance from the Torrance Post Office. The TPD officer observed that the Infinity FX3 had tinted windows, in violation of California Vehicle Code Section 26708.5(a), and that the license plate lamp was inoperable, in violation of California Vehicle Code Section 24601, and initiated a traffic stop.

35.   TPD contacted the driver who was wearing a black backwards baseball hat with a white "W" (Washington Nationals logo) (later identified as DE LEON).  DE LEON said he did not

---

[5]   The license plate, which had been recorded during a prior incident, was initially reported as 8JTP110.  TPD later confirmed that the correct license plate number was 8JIP110.

have a driver's license on him, and a strong odor of burnt marijuana emitted from the vehicle.  After conducting a records check, TPD determined that DE LEON was driving without a valid license in violation of California Vehicle Code Section 12500, and that the car registration was expired.  DE LEON was asked to exit the Infinity FX3 and informed that he was being detained pending further investigation.  The female front passenger (later identified as JIMENEZ) and the two rear occupants (later identified as E.J.A. and R.M.B., both juveniles) were also asked to exit the Infinity FX3 and informed that they were being detained.  None of the individuals were placed in handcuffs.

36.  DE LEON provided consent to search the Infinity FX3. During the search, TPD recovered and seized the following:

a.    From the front driver's-side door pocket: approximately 76 personal and business checks not in the name of DE LEON or JIMENEZ or any of the occupants, along with ATM deposit receipts.  These checks had addresses located in Montebello, Pico Rivera, Vernon, and East Lost Angeles.  Eight of the checks were issued by MUSD.

b.    From the center console: approximately 10 Visa debit cards that did not belong to DE LEON or JIMENEZ or any of the occupants, including Bank of America debit cards.  In addition, during the search, DE LEON was overheard telling JIMENEZ that one of the cards had over $20,000 on it.

c.    From the front passenger floorboard: multiple pieces of mail that did not belong to DE LEON or JIMENEZ or any of the occupants.

d.   From adjacent to the center console: SUBJECT DEVICES 1 and 2, with DE LEON and JIMENEZ each admitting that the respective devices belonged to them.

37.   Given the items found in the vehicle, TPD checked law enforcement databases for any potentially related crimes, and identified the robbery at the Montebello Post Office which was also conducted by a vehicle matching the description of the Infinity FX3, by one female in her 20s to 30s with dirty blonde hair and a heavy-set dark-complected Hispanic Male driver.  DE LEON and JIMENEZ were then placed under arrest for a violation of California Penal Code Section 211 - Robbery.  Field interviews were conducted of both E.J.A. and R.M.B., the juveniles, who were subsequently released.

38.   I interviewed DE LEON and JIMENEZ while in custody.  I informed them that the USPIS had videos of them stealing mail, and that it was a federal crime to steal mail.  Both denied any involvement.

**J.   RODRIGUEZ and Two Unidentified Suspects Carry Out a Hit Using SUBJECT VEHICE 1 at Norwalk Post Office on February 2, 2022**

39.   On February 3, 2022, the Postmaster of the Norwalk Post Office located at 14011 Clarkdale Ave, Norwalk, California 90650 reported to USPIS that on February 2, 2022, at approximately 2:30 p.m., a suspect conducted a hit at the Norwalk Post Office with SUBJECT VEHICLE 1, a black BMW.

40.   The surveillance footage from the loading dock area shows SUBJECT VEHICLE 1 pulling up and parking next to the loading dock.  A heavy-set Hispanic female suspect with dark

hair exits the front passenger side and a male (later identified
as RODRIGUEZ) exits the rear passenger side.  Both suspects
climb onto the dock and walk around while appearing to look for
mail.  The female grabs a tub of mail and sets it on the edge of
the dock.  RODRIGUEZ grabs the tub and both suspects jump off
the dock and return to SUBJECT VEHICLE 1 and drive away.  The
driver is not visible due to the dark tint on the vehicle's
windows.

41.  The male suspect appears to be young and Hispanic,
with short hair and a medium build.  The suspect is wearing a
black surgical mask over his mouth and a black t-shirt with
white and gray jeans.  At one point in the video, a large tattoo
is visible on the front of his neck.

42.  I reviewed law enforcement databases and learned that
the license plate of SUBJECT VEHICLE 1 was identified parked
near the SUBJECT PREMISES on February 2, 2022 at 1:16 a.m.,
leading me to believe that the individuals who own or drive
SUBJECT VEHICLE 1 sleep at the SUBJECT PREMISES.

**K.  DE LEON and Two Unidentified Suspects Carry Out a Hit
Using A Black 3-Series BMW at Norwalk Post Office on
February 3, 2022**

43.  On February 4, 2022, the Postmaster of the Norwalk
Post Office located at 14011 Clarkdale Ave, Norwalk, California
90650 reported to USPIS that on February 3, 2022, at
approximately 3:20 p.m., two men (one of whom I later identified
as DE LEON) conducted a hit at the Norwalk Post Office with a
black 3-series BMW ("3-series BMW," not SUBJECT VEHICLE 1).

44.   The surveillance footage from the loading dock area shows the 3-series BMW pulling up and parking near the loading dock.   DE LEON and the other suspect walk onto the dock and appear to be looking for mail to steal.   DE LEON takes a mail tub and hands it to the other suspect.   DE LEON then grabs a handful of mail from a container on the dock and places mail into the tub.   A postal supervisor, L.B., realized that these were the suspects from previous hits and confronted DE LEON and the other suspect on the dock.   L.B. reached for the tub, to try to take the stolen mail back, but lost his/her balance and fell head-first into some equipment on the dock.   One suspect jumped off the dock with the tub of mail and returned to 3-series BMW.   DE LEON also ran back to 3-series BMW, before it sped off. L.B. described the two suspects as Hispanic males with olive-toned skin, both wearing black, hooded sweatshirts, with one slightly heavier than the other.

45.   Video surveillance footage was recovered from the Norwalk Post Office.   I reviewed surveillance video from the dock of the Norwalk Post Office and identified DE LEON as one of the two suspects stealing the mail.   DE LEON is wearing a black Nike sweatshirt with the hood up, a backwards baseball cap with what appears to be the Major League Baseball logo visible, gray sweatpants and white and black sneakers.   DE LEON is wearing a clinical face mask and what appears to be a gold bracelet on his right wrist in the video.

**L.   Presence of DE LEON and RODRIGUEZ at SUBJECT PREMISES, Identification of RODRIGUEZ as a Target Subject, and Prior Arrests for Possession of Firearms Despite RODRIGUEZ's Prohibited Status**

46.  As described above, or about February 8, 2022, an LASD deputy informed me that on September 29, 2021, local law enforcement executed a search warrant on the SUBJECT PREMISES, and DE LEON, RODRIGUEZ, and J.J.N. were found to be residing there.

47.  Based on law enforcement reports, RODRIGUEZ was also arrested on January 12, 2022, for evading a peace officer and disregard of safety in violation of California Vehicle Code Section 2800.2(a) and carrying an unregistered loaded handgun in violation of California Penal Code Section 25850(c)(6).

48.  Utilizing law enforcement databases, I reviewed RODRIGUEZ's booking photos dated January 12, 2022 and observed a large "92" tattoo on the front of his neck.  Based on this, I identified RODRIGUEZ as the suspect in the surveillance footage of the February 2, 2022 hit at the Norwalk Post Office. RODRIGUEZ also has a noticeable "widow's peak," or a v-shaped point in the center of his hairline, that is visible in both his booking photos and the surveillance video from the dock of the Norwalk Post Office.

49.  On or about February 14, 2022, I spoke with SA Al Rossi of Homeland Security Investigations regarding RODRIGUEZ's immigration status and learned that he was found inadmissible pursuant to section 212(a)(7)(A)(i)(I) - Inadequate Documentation of the Immigration Naturalization Act and was

processed for Expedited Removal with Credible Fear.  RODRIGUEZ
has appealed this order and is scheduled for a hearing before an
Immigration Judge on July 1, 2022.  According to SA Rossi,
Rodriguez constitutes an alien who is prohibited from being in
possession of firearms or ammunition pursuant to 18 U.S.C.
922(g)(5).

> **M.   SUBJECT VEHICLE 1 is Parked in Front of the SUBJECT PREMISES Less Than Two Hours Before Two Unidentified Target Subjects Carry out a Hit Using SUBJECT VEHICLE 1 at the Montebello Post Office on February 4, 2022**

50.   On February 4, 2022, at approximately 11:43 a.m., I
conducted surveillance at the SUBJECT PREMISES and saw SUBJECT
VEHICLE 1 parked on the street directly in front of the
residence.

51.   Less than two hours later, at approximately 1:23 p.m.,
a USPS Employee reported that he/she witnessed a hit at the
Montebello Post Office.  The USPS employee saw SUBJECT VEHICLE 1
pull up and park next to the loading dock.  A suspect, described
as a Hispanic female in her late 20's, short in stature, wearing
a hoodie with hood up, exited the front passenger side and
grabbed a tub of mail from the edge of the loading dock.  The
female suspect then returned to SUBJECT VEHICLE 1, which drove
off.

52.   The USPS employee was able to capture several photos
of the rear of SUBJECT VEHICLE 1 using his/her phone.  I
reviewed the photos and identified SUBJECT VEHICLE 1, based on
its license plate, as the same vehicle I saw parked in front of
the SUBJECT PREMISES just a short period earlier.

53.   Based on my surveillance, SUBJECT VEHICLES 1 and 3 were also parked near the SUBJECT PREMISES on February 11, 2022 at 9:42 a.m.

**N.    Presence of SUBJECT VEHICLES 1 Through 3 at the SUBJECT PREMISES Before and After Mail Hits**

54.   As discussed above, SUBJECT VEHICLES 1 through 3 were used by the Target Subject to carry out at least six hits on Post Offices in the Central District of California.

55.   Law enforcement surveillance and databases have placed SUBJECT VEHICLES 1 though 3 at the SUBJECT PREMISES in the hours or days directly before or after Target Subjects were conducting hits, namely:  SUBJECT VEHICLE 1 has been placed at the SUBJECT PREMISES in the early morning on February 2, 2022, directly before it was used to conduct a hit on the Norwalk Post Office later that day and again at the SUBJECT PREMISES on the morning of February 4, 2022, two hours before it was used to carry out a hit on the Montebello Post Office; SUBJECT VEHICLE 2 has been placed at the SUBJECT PREMISES on December 5, 2021 and December 9, 2021, in the days after it was used to conduct the December 2, 2021 hit on the Montebello Post Office; and SUBJECT VEHICLE 3 has been placed at the SUBJECT PREMISES on December 9, 2021, directly after it was used to conduct the December 8, 2021 hit on the Buena Park Post Office.  (The Infinity FX3 was stopped by TPD near the Torrance Post Office, directly after it was canvassing the postal dock.)

56.   In addition, based on a law enforcement report relating to the execution of a search warrant of the SUBJECT

PREMISES, two of the Target Subjects, DE LEON and RODRIGUEZ (as well as J.J.N.) resided at the SUBJECT PREMISES as of September 29, 2021.

57. Based on my review of law enforcement databases, DE LEON, RODRGIUEZ and JIMENEZ are not listed as registered owners of SUBJECT VEHICLES 1 through 3 or the Infinity FX3. Based on my training and experience, individuals who use vehicles to engage in criminal conduct will not register those vehicles in their own names, to avoid detection by law enforcement.

**O. Target Subjects' Gang-Affiliation with South Side Locos**

58. RODRIGUEZ and DE LEON both have tattoos – RODRIGUEZ has the number "92" and DE LEON has the letters "SL". Based on my discussions with law enforcement officers specializing in gang activity in the South Los Angeles Area, tattoos of the number "92" and "SL" are indicative of gang affiliation with the South Side Locos, a gang whose known territory is the area near the cross streets of 92nd Avenue and Budlong Avenue. J.J.N. has tattoos that read "SC" or "SS Locos", also indicative of gang affiliation with the South Side Locos. Based on my training and experience, the Target Subjects appear to be members of or affiliated with the same gang, the South Side Locos.

**P. Bulk Mail Delivery at Postal Loading Docks and Monetary Losses by Postal Dock Theft Victims During the Timeframe of the Hits**

59. Among other things, loading docks are where corporations and other entities drop off tubs and trays of mail in bulk. Based on my training and experience, this bulk mail

frequently includes large value checks from corporations or entities.

60.   Follow up investigation with Bank of America revealed the following:  Five deposits were made on December 16, 2021 into accounts affiliated with the debit cards and ATM receipts found in the Infinity FX3 by TPD following the traffic stop on December 20, 2021, described above.  Those deposits totaled approximately $29,000, at the same ATM location in Los Angeles, in the Central District of California.  None of these accounts were in the name of DE LEON, yet DE LEON is recognizable in ATM footage depositing the checks.

61.   One of these checks was written out by MUSD.  A representative from MUSD informed me that they drop off bulk checks at the Montebello Post Office's dock, and made a delivery of checks to the dock on December 16, 2021.  To date, MUSD has identified approximately $300,000 in fraudulently negotiated checks from December 2021 which were dropped off at the Montebello Post Office dock.

62.   In addition, based on my conversations with a representative of LAUSD, I discovered that mail from LAUSD is regularly placed in the mail, picked up by a local mail carrier and dropped off as bulk mail at the Pico Rivera Post Office loading dock.  Mail containing a significant number of checks was picked up by the local mail carrier, between December 15, 2021 and on or about December 23, 2021.

63.   LAUSD has reported close to $2 million stolen via fraudulently negotiated checks.  Specifically, in the month of

December, approximately 97 of those mailed checks totaling approximately $1,969,791 never made it to the intended recipients including companies that provide school equipment, learning materials, tutoring services and food services.

64.  Based on information provided by LAUSD's remitting financial institution, those checks were deposited into bank accounts at a number of financial institutions, but, as of February 14, 2022, the funds have been largely drained out of those accounts.  For example, Bank of America reported that out of $92,000 in checks deposited into individual checking accounts held by Bank of America, only approximately $3,000 are left in those accounts.  Similarly, Wells Fargo reported that out of approximately $1,819,000 in checks deposited into individual checking accounts held by Wells Fargo, only approximately $300,000 remains in those accounts.

*     *     *

65.  Based on the above, as well as my training and experience, I believe there is probable that evidence and fruits of the Subject Offenses, including stolen mail, will be found at the SUBJECT PREMISES, in SUBJECT VEHICLES 1 through 3, in the SUBJECT DEVICES and on DE LEON's, JIMENEZ's and RODRIGUEZ's persons.

## V.  TRAINING AND EXPERIENCE REGARDING MAIL AND IDENTITY THEFT CRIMES

66.  Based on my training and experience, including being a member of a USPIS Mail Theft Team, and information obtained from

other law enforcement officers who investigate mail and identity theft, I know the following:

a.   Persons who steal mail are often involved in fraud and identity theft crimes.  These individuals usually steal mail looking for checks, access devices, other personal identifying information (such as names, Social Security numbers, and dates of birth), and identification documents that they can use to fraudulently obtain money and items of value.  Mail thieves often retain these items of value from stolen mail in order to make fraudulent purchases or sell the items to others in exchange for cash or drugs.

b.   Persons who steal mail usually keep the mail they have stolen, or items stolen from the mail such as checks, access devices, other personal identifying information (such as names, Social Security numbers, and dates of birth), and identification documents in their residence, or in places that are readily accessible such as their vehicles, and under their physical control, such in their digital devices.

c.   It is common practice for individuals involved in mail theft, identity theft, bank fraud, and access device fraud crimes to possess and use multiple digital devices at once. Such digital devices are often used to facilitate, conduct, and track fraudulent transactions and identity theft.  Suspects often use digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet.  They often employ digital devices for the purposes, among others, of: (1) applying online

25

for fraudulent credit cards; (2) obtaining or storing personal identification information for the purpose of establishing or modifying fraudulent bank accounts and/or credit card accounts; (3) using fraudulently obtained bank accounts and/or credit card accounts to make purchases, sometimes of further personal information; (4) keeping records of their crimes; (5) researching personal information, such as social security numbers and dates of birth, for potential identity theft victims; (6) verifying the status of stolen access devices, and (7) communicating and planning with co-conspirators.

     d.   Often times mail and identity thieves take pictures of items retrieved from stolen mail or mail matter with their cellphones.

     e.   It is also common for mail and identity thieves to keep "profiles" of victims on digital devices. Such "profiles" contain the personal identifying information of victims, such as names, Social Security numbers, dates of birth, driver's license or state identification numbers, alien registration numbers, passport numbers, and employer or taxpayer identification numbers.

     f.   It is common for mail thieves, identity thieves, and individuals engaged in bank fraud, access device fraud, and identification document fraud to use equipment and software to print credit and identification cards, to create magnetic strips for credit cards, to use embossing machines to create credit cards, to use laser printers to create checks, and to use magnetic card readers to read and re-encode credit cards.

26

Software relevant to such schemes can often be found on digital devices, such as computers.

g.   Based on my training and experience, I know that individuals who participate in mail theft, identity theft, bank fraud, and access device fraud schemes often have co-conspirators, and often maintain telephone numbers, email addresses, and other contact information and communications involving their co-conspirators in order to conduct their business.  Oftentimes, they do so on their digital devices. Suspects often use their digital devices to communicate with co-conspirators by phone, text, email, and social media, including sending photos.

### VI. <u>TRAINING AND EXPERIENCE ON FIREARMS OFFENSES</u>

67.  From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

a.   Persons who possess, purchase, or sell firearms, including possessing or using firearms in robberies, generally maintain records of their firearm transactions as items of value and usually keep them in places that are readily accessible, and under their physical control, such in their digital devices.  It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future

purchases or referrals.  Such information is also kept on digital devices.

       b.   Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

       c.   Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

## TRAINING AND EXPERIENCE ON DIGITAL DEVICES[6]

68.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has

---

[6] As used herein, the term "digital device" includes SUBJECT DEVICES 1 and 2, as well as any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

69.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

e.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

f.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

70.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

g.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a

device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

       h.   In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked
for a certain period of time (often 48 hours or less), or after
a certain number of unsuccessful unlock attempts.  Thus, the
opportunity to use a biometric unlock function even on an
enabled device may exist for only a short time.  I do not know
the passcodes of the devices likely to be found in the search.

       i.   Thus, the warrant I am applying for would permit
law enforcement personnel to, with respect to any device that
appears to have a biometric sensor and falls within the scope of
the warrant: (1) depress DE LEON's, JIMENEZ's and RODRIGUEZ's
thumb and/or fingers on the device(s); and (2) hold the
device(s) in front of DE LEON's, JIMENEZ's and RODRIGUEZ's face
with his or her eyes open to activate the facial-, iris-, and/or
retina-recognition feature.

       j.   Other than what has been described herein, to my
knowledge, the United States has not attempted to obtain this
data by other means.

## VII. <u>CONCLUSION</u>

71.  For all of the reasons described above, there is
probable cause to believe that DE LEON, JIMENEZ and RODRIGUEZ
have each committed a violation of Title 18, United States Code,
Section 1708 (Mail Theft).

72.   There is also probable cause that the items to be
seized described in Attachment B, which constitute evidence,
fruits, and instrumentalities of violations of violations of the
Subject Offenses, will be found in a search of the locations
described in Attachments A-1, A-2, A-3, A-4, A-5, A-6, A-7, A-8
and A-9.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 16th day of
February, 2022.

_____
THE HONORABLE PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE